853 So.2d 559 (2003)
Douglas PEEBLES, M.D., Gerry Baran, M.D., Alan Ast, M.D., Monte Bernstein, M.D., Robert Chaikin, M.D., Karen Chesire, M.D., Michael Horn, M.D., Neil E. Ross, M.D., Gary Karch, M.D., and Paul Pavilack, M.D., Appellants,
v.
SHERIDAN HEALTHCARE, INC., Mitchell Eisenberg, M.D., Lewis D. Gold, M.D., Jay A. Martus, Esq., Levey & Martus, P.A., and Levey, Martus & Gilbert, P.A., Appellees.
No. 4D02-172.
District Court of Appeal of Florida, Fourth District.
September 3, 2003.
*560 Edna L. Caruso of Caruso, Burlington, Bohn & Compiani, P.A., West Palm Beach, Garry W. O'Donnell of Adorno & Yoss, Boca Raton, and John P. Kelly of Lorusso & Loud, Fort Lauderdale, for appellants.
Bruce Rogow and Beverly A. Pohl of Bruce S. Rogow, P.A., Fort Lauderdale, William Scherer and James F. Carroll of Conrad & Scherer, Fort Lauderdale, for appellees.

ON MOTION FOR CLARIFICATION
KLEIN, J.
We withdraw our opinion filed on July 16, 2003 and substitute the following opinion.
After a group of twenty-five anesthesiologists sold their practice to a management company which retained them as employees, ten of them sued their former president, their lawyer, and others, alleging fraud, breach of fiduciary duty, conspiracy, legal malpractice, and securities violations. Although the jury found for plaintiffs on some of the counts, it did not find any of the defendants guilty of fraud. The trial court then concluded that the counts on which the plaintiffs recovered were barred as a matter of law by the documents plaintiffs signed which included broad releases. The plaintiffs appeal and we affirm.
The physicians were practicing as Southeastern Anesthesia Management Associates, Inc. (SAMA), some of them owning Class A stock and others Class B. Dr. Eisenberg was the president and managed the practice, and Attorney Jay Martus was the general counsel. SAMA was sold through a venture capital firm, T.A. Associates, to a newly created entity, Sheridan Healthcare, Inc. The purchase price was $45 million and, out of the net proceeds of the sale, each Class A shareholder received $1,881,000 and each Class B shareholder received $1,250,000.
The physicians on the whole did not receive stock in the new entity, but did have employment agreements with it. Ten of them brought this lawsuit after discovering that Dr. Eisenberg, Martus, and several others were involved in the management of the new entity, and had received shares of stock in the new entity in varying amounts which totaled 18.5 percent. The essence of their claim was that they had been led to believe by the defendants that everyone was receiving the same deal in the buyout, that all would have the same chance to be involved in management and own stock in the new entity, and that these representations were false. In addition to Dr. Eisenberg and Martus, plaintiffs sued another physician, Lewis Gold and the new owner of the practice, Sheridan.
Count I alleged violations of Florida's Securities and Investment Act, Chapter 517, Florida Statutes. Count II alleged fraud in the inducement. Count III alleged conspiracy. Count IV alleged breach of fiduciary duty, and Count V alleged legal malpractice against Martus. The jury found Dr. Lewis and Sheridan not guilty on all counts. It found Dr. Eisenberg and Martus guilty on Count I, securities violations, Count III, conspiracy, Count IV, breach of fiduciary duty and against Martus on Count V, malpractice. None of the defendants were found guilty on the count alleging fraud in the inducement.
On post trial motions the trial court ruled that the claims on which verdicts were returned for plaintiffs were barred by the documents signed by plaintiffs.
*561 The essence of the court's holding was that, regardless of what plaintiffs had been led to believe prior to the sale of the practice, the documents they signed in order to receive their share of the buyout not only released the defendants, but also made known to them that Dr. Eisenberg and others would be involved in the management of the new company and receive stock.
The stock purchase agreement signed by each of the plaintiffs explained that Dr. Eisenberg would, and others could be involved in the management of, and receive stock in, the new entity:
(b) Each Seller ....(iv) understands and acknowledges that certain members of management of SAMA selected by the Board of Directors of the Company [SAMA Holdings, Inc.] in its sole discretion, which members of management shall include Dr. Mitchell Eisenberg and may include several physicians and non-physician administrators or other professionals currently employed, or engaged in the future, by SAMA, its Subsidiaries or AMSA, PC (each, a "Manager"), are expected to be offered stock, options, incentive compensation and/or other interests in the Company to which the Seller will not be entitled unless he is selected as Manager and are expected to enter into employment agreements on terms that may be substantially different from the terms of the employment agreements referenced in Section 7.01(1) hereof, (v) understands and acknowledges that he has received no guarantee, promise or assurance, and (except for Dr. Eisenberg) has no understanding or expectation, that he will be named as a Manager, and (vi) understands that the prospects of SAMA, its Subsidiaries, AMSA, PC and the Company and the value of SAMA, its Subsidiaries, AMSA, PC and the Company may improve significantly and that he will not participate in any such improvement after the sale of Shares hereunder (unless he is a Manager, in which case the terms of his participation will be as set forth in the Investment Agreement (as defined in Section 7.01(n)) ...
In addition, plaintiffs each acknowledged that they had "not relied upon any representations, warranties or agreements of any person other than those set forth in this Agreement."
And, the releases provided that each plaintiff:
releases and discharges the Company [Sheridan] ... and each of the present and former stockholders, directors, officers, employees, attorneys and agents of the Company, SAMA ... from any and all ... claims and causes of action both in law and in equity ... in connection with the SAMA transaction.
Viewing the evidence in a light most favorable to plaintiffs, and therefore assuming that misrepresentations were made prior to the signing of the releases and other documents, those documents, which are clear and unambiguous, preclude plaintiffs' claims as a matter of law.
In Hillcrest Pacific Corp. v. Yamamura, 727 So.2d 1053, 1056 (Fla. 4th DCA 1999), the plaintiff had purchased a golf course for over $9 million. Plaintiff later sued a real estate broker and others for failing to reveal that the seller was only seeking to net $6.2 million, and had agreed to pay any amount over and above that as finder's fees or commissions. In holding that the complaint did not state a cause of action for fraud in the inducement, breach of fiduciary duty, and conspiracy, we explained:
In this case, the Agreement plainly contradicts the allegations of the complaint and is fatally inconsistent with *562 Pacific's claim of fraud in the inducement. Although Pacific alleges that the appellees misrepresented the "price" of the Property, the price is clearly stated in the Agreement. Furthermore, the Agreement contains an integration clause that expressly extinguishes all prior negotiations and "sales pitches." A party cannot recover in fraud for alleged oral misrepresentations that are adequately covered or expressly contradicted in a later written contract. See Englezios v. Batmasian, 593 So.2d 1077 (Fla. 4th DCA 1992); Greenwald v. Food Fair Stores Corp., 100 So.2d 200 (Fla. 3rd DCA 1958). (Emphasis supplied.)
The claims for security violations, conspiracy, breach of fiduciary duty, and malpractice in the present case are all based on claims which are plainly contrary to the information provided plaintiffs in the stock purchase agreements and are barred for the same reasons that the fraud claim was barred in Yamamura. In addition to knowing who would or could own stock and be in management of the new company, before they agreed to the buyout, plaintiffs also released the corporation and the individuals they sued from the claims they made in this case.
Plaintiffs argued that Martus is not protected by the release because he is an attorney, relying heavily on Kenet v. Bailey, 679 So.2d 348 (Fla. 3d DCA 1996). That case is distinguishable in that there a lawyer, who at no time had any claim to funds being held in his trust account, converted the funds to his own use. The lawyer then claimed that a release, executed when a limited partnership, in which the lawyer and the client had an interest, was dissolved, barred the client's claim to the client's own funds. Not surprisingly the court saw through this subterfuge and held that the release involving the dissolution of the limited partnership had nothing to do with the trust funds. Kenet is accordingly not on point.
The factual basis for the claims against Martus for malpractice and breach of fiduciary duty involved an alleged conflict of interest as a result of his relationship with both the buyer and the seller, nondisclosure of his future position with the buyer, and conspiracy with Dr. Eisenberg to orchestrate a buyout on unfair terms. The release, however, clearly covers all acts by Martus as attorney and agent arising out of his conduct in the transaction. Argyle Capital Mgmt. Corp. v. Lowenthal, Landau, Fischer & Bring, P.C., 261 A.D.2d 282, 690 N.Y.S.2d 256 (N.Y.App.Div. 1999)("agents" identified as released parties under release included counsel to the parties to investment, thus counsel and other agents were shielded by the release from any liability for legal malpractice); Doyle v. Shlensky, 120 Ill.App.3d 807, 76 Ill.Dec. 466, 458 N.E.2d 1120 (1983); see also Cerniglia v. Cerniglia, 679 So.2d 1160 (Fla.1996)(where the language of a release is clear a court cannot entertain evidence contrary to the plain meaning of the release).
This case is distinguishable from cases such as The Florida Bar v. Jordan, 705 So.2d 1387 (Fla.1998) and The Florida Bar v. Nemec, 390 So.2d 1190 (Fla.1980), in which lawyers had improperly attempted to settle malpractice claims directly with clients without advising the clients to seek independent counsel. First, there was no malpractice claim existing in the present case, when the releases were signed. Second, in Jordan and Nemec there were only two parties, the lawyer and the client, while in the present case the parties included five corporations, all of the stockholders of two of the corporations, but the lawyer, Martus, was not a party. In addition, as we noted earlier, the claims asserted *563 against Martus were all inconsistent with the acknowledgments contained in the stock purchase agreements.
In the present case, when plaintiffs signed the documents they knew that Dr. Eisenberg and other physicians, which might not include them, could receive preferential treatment in the new company. They also knew that Martus could have a position with the new company. If this was not acceptable, plaintiffs should not have signed on. They cannot now claim that they relied on prior representations which were contrary to what was plainly explained in the documents.
Affirmed.
SHAHOOD and TAYLOR, JJ., concur.